Filed 2/13/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B332399 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA499123) |
| v. | |
| AQUIL QADIR LAWSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The goal of the California Racial Justice Act of 2020 (Racial Justice Act; Stats. 2020, ch. 317) is to "eliminate racial bias from California's criminal justice system" and "ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).) In passing the Act, the Legislature recognized that racial bias "persists" in our criminal justice system "because courts generally only address racial bias in its most extreme and blatant forms." (*Id.*, § 2, subd. (c).) The Act acknowledges that "all persons possess implicit biases" that "impact the criminal justice system," and these biases "tend to disfavor people of color." (*Id.*, § 2, subd. (g).)

In this case, defendant Aquil Qadir Lawson appeals from his conviction for murder. Defendant, who is black, contends the trial court's evidentiary rulings emphasized defendant's criminality while minimizing that of his white victim. Defendant argues these rulings were motivated by the trial court's implicit racial bias, thus violating Penal Code section 745, a provision of the Racial Justice Act. We conclude the rulings challenged by defendant were ordinary evidentiary rulings based on relevance and do not demonstrate implicit racial bias under the Racial Justice Act's preponderance-of-the-evidence standard. We affirm.

## BACKGROUND

Defendant shot and killed Madison Rose Weiss as she sat in her car. The People by information charged defendant with murder, alleging a firearm enhancement under Penal Code section 12022.5, subdivision (a) as well as circumstances in aggravation under California Rules of Court, rule 4.421. At trial, defendant admitted shooting Weiss, but contended he did so in self-defense.

2

1.    *Pretrial motions in limine*

In advance of trial, the prosecution moved to admit videos, photographs, and chat exchanges from defendant's Instagram account.  The prosecution represented that defendant made "several admissions related to the murder" in his Instagram posts, as well as "admissions related to his propensity for violence."  The prosecution further represented that in the posted photos, defendant was dressed in the clothing and jewelry he wore at the crime scene.

At the hearing on the motion, the prosecution noted defendant was "a music artist" and the prosecution wished to avoid problems with recent amendments to the Evidence Code limiting evidence of artistic expression in criminal trials.  The court asked if defendant "rap[ped] about killing" Weiss.  After discussion as to the specific content of the Instagram posts the prosecution wished to introduce, the court stated, "Well, if it relates to this particular incident, then I think rap lyrics are admissible.  But if they're just general rap lyrics about violence or . . . his general feelings about women and violence, I don't think that's relevant.  I think it's precluded by [the Evidence Code amendments]."  After further discussion, the prosecution stated it would limit the Instagram evidence in its case-in-chief to five of defendant's statements on Instagram related to the shooting, and the defense stated it had no objection to the admission of that evidence.

The prosecution also successfully moved to exclude certain evidence from trial.  First, the prosecution moved to exclude text messages between Weiss and a third party concerning production of counterfeit COVID-19 vaccination cards.  In those messages, Weiss stated, "I do too much illegal shit already lmfao let's keep

it safe as possible." The third party then described a plan to produce the counterfeit cards, including obtaining the necessary supplies, to which Weiss did not respond. The prosecution contended the evidence was irrelevant and inadmissible under Evidence Code sections 352 and 1101, subdivision (b). The court noted that if Weiss were a testifying witness, her involvement in counterfeiting vaccination cards might be relevant to her credibility, but because she was deceased, the evidence was not relevant.

Second, the prosecution moved to exclude reference to the death of Ozana Smith-DaSilva, whom defendant referred to as "Lizzle." The prosecution described Smith-DaSilva as "a close friend of defendant's" and a friend of Weiss as well. The prosecution averred that Smith-DaSilva's death was determined to have resulted from an accidental drug overdose. Defendant was the one who discovered her body at an Anaheim hotel, and when interviewed by police, he described Smith-DaSilva as his "soulmate" and discussed how her death impacted his mental health. The prosecution was unaware of any admissible evidence linking Weiss to DaSilva's death, and therefore requested to exclude any reference to her death at trial absent a showing of relevance and admissibility. The court tentatively granted the motion to exclude this evidence as irrelevant. The court stated this was without prejudice to the defense making a showing of relevance at trial, which the court would "certainly listen to."

Third, the prosecution moved to exclude evidence of a backpack containing a loaded firearm discovered the day after the shooting on a rooftop three blocks from the crime scene. The prosecution stated it was unaware of any known tie between, on the one hand, Weiss, the defendant, or the charged crime, and on

4

the other hand, the building where the backpack was found, the individual who found the backpack, or the individual to whom the firearm was registered.  The prosecution contended the evidence should not be admitted absent a showing of relevance.  After confirming with the prosecution that the discovered gun was not the gun used in the charged crime, the court granted the motion to exclude the evidence.

Fourth, the prosecution moved to exclude references to or evidence of Weiss's activity as a sex worker, including cell phone messages, text messages, and internet activity.  The prosecution asserted Weiss had never been arrested or convicted of prostitution, and the evidence of her engagement in sex work should not be admitted without a showing of relevance and admissibility.  The court agreed that purported sex work by Weiss was not relevant and granted the motion.

## 2.    *Evidence at trial*

The following summary is limited to the evidence admitted at trial relevant to the issues on appeal.

### a.    *Relevant prosecution evidence*

Weiss owned a clothing brand called Opium Rose.

On cross-examination, defendant admitted he engaged in unemployment fraud and pay loan protection fraud.

The prosecution presented the following evidence from defendant's Instagram account:

A photograph of defendant had writing on the bottom stating, "623 God's Fearless."  A police detective testified defendant had the number 623 tattooed between his eyebrows.

A video posted a few hours after the shooting depicted defendant stating, "That's a new pakkk.  Shit smell like roses."

5

Text scrolling across the video repeated this statement. The detective testified "pakkk" is slang for a dead body.

A screenshot contained text stating, "You exposed yaself goofy. Once you done crossed da takers da wrong way, you won't make it alive. We turning all the opps to pakkks on 623." The detective testified "opps" referred to "opposition," and that defendant referred to himself several times in his social media account as "the taker," "rich takers," or "takers."

Another screenshot contained text stating, "The devil's playground," followed by, "We into it till you die, real," "I bet dat bitch in dat car still twitchin," and "Now we blowin on dat rose pakkk cuz bitches getting smoked n.a.," followed by emojis depicting frozen faces, a rose, and smoke signals.

### b. *Relevant defense evidence*

Defendant testified that earlier in the evening of the shooting, he was riding a scooter in downtown Los Angeles. Someone in a white Mercedes honked at him. The window rolled down, and he saw Weiss, whom he knew but had not seen in about a year.

Weiss invited defendant into her car. Once defendant was inside the car, Weiss immediately grew angry, and asked him why he was "snitching" and trying to "go to the cops." Weiss told him she had "nothing to do with Lizzle." The prosecution objected, and the court struck the reference to Lizzle. Continuing his testimony, defendant stated he responded to Weiss, "I'm not never gonna never stop until I figure out exactly what happened," and Weiss said, "I'm not going to jail. I'll shoot you right now." Defendant got out of the car, and Weiss said, "You gonna die," followed by a racial epithet.

Defendant testified he did not see a gun in Weiss's possession, but she was clutching a pocketbook on her lap, and he had "seen her put her gun in her purse plenty of times" on previous occasions.

After defendant got out of Weiss's car, he went into a nearby marijuana dispensary. When he came out of the shop, he saw a man standing across the street that on a previous occasion he had seen with Weiss. He then noticed Weiss was still sitting in her car. He saw Weiss "raising her hand like she was gonna shoot me," and defendant "totally freaked out." He also saw the man across the street "inching over." Defendant pulled out his pistol because he "believed that I was about to die at this moment." Defendant fired twice through the passenger side window of Weiss's vehicle. He dropped his gun, then picked it up and rode away on his scooter.

### 3.   *Conviction and sentencing*

The jury found defendant guilty of second degree murder and found the firearm allegation true. The court then conducted a trial on the alleged circumstances in aggravation. The jury found true the allegations that defendant showed a lack of remorse and that the crime involved a high degree of viciousness, callousness, or cruelty.

At sentencing, the trial court denied the defense's request to strike the circumstances in aggravation. The court stated, "[W]hat I learned after the submission of all of the evidence is that this defendant is a thief, he's a fraudster, he's a liar, and he's a coward. Cowardly in the way he shot Madison as she sat behind the wheel of her car presenting no danger to anyone." The court sentenced defendant to 15 years to life for the murder plus 10 years, the upper term for the firearm enhancement, for a

7

total of 25 years to life.  The court awarded no credits and imposed fines and fees.

Defendant timely appealed.

## DISCUSSION

### A.     The Racial Justice Act

Penal Code[1] section 745, subdivision (a), a provision of the Racial Justice Act, sets forth four categories of conduct that, if proven by a preponderance of the evidence, establish a violation of the Act.  (See *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.)  In this appeal, defendant relies on section 745, subdivision (a)(2), which establishes a violation of the Act if, "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."

Section 745, subdivision (h)(4) defines " '[r]acially discriminatory language' " as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where

---

[1] Unspecified statutory citations are to the Penal Code.

the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."

A defendant may raise a violation of section 745, subdivision (a) in several ways, including by motion in the trial court, a petition for writ of habeas corpus, or, if the claim is based on the trial record, on direct appeal.[2] (§ 745, subd. (b).) A defendant on appeal may also move to stay the appeal and request remand to the trial court so the defendant may file a section 745 motion. (*Ibid.*)

A defendant raising a section 745 challenge by motion in the trial court must make a prima facie showing of a violation of section 745, subdivision (a). (§ 745, subd. (c).) A prima facie showing requires "facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred. . . . [A] 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (§ 745, subd. (h)(2).) If the defendant satisfies the prima facie showing, the trial court shall hold an evidentiary hearing, at which "[t]he defendant shall have the burden of proving a violation of [section 745,] subdivision (a) by a preponderance of the evidence. The defendant does not need to prove intentional discrimination." (§ 745, subd. (c)(2).)

Here, however, defendant did not make a section 745 motion in the trial court, nor does he request that we stay his appeal so he may do so. Rather, he asks that this court conclude, based on the trial record, that his "conviction was obtained through violation of the Racial Justice Act" and therefore must be

---

[2] A person no longer in criminal custody may raise a Racial Justice Act challenge through a motion to vacate a conviction or sentence under section 1473.7. (See § 1473.7, subd. (a)(3).)

vacated.  Accordingly, we are not reviewing any Racial Justice Act findings by the trial court, of which there are none.  Instead, we independently review the record to determine if defendant has demonstrated, by a preponderance of the evidence, a violation of section 745, subdivision (a).  (See *People v. Coleman* (2024) 98 Cal.App.5th 709, 722–723 (*Coleman*) [concluding, based on trial record, appellant did not demonstrate by preponderance of evidence racial animus or bias on part of defense counsel].)

**B.     We Decline To Address Forfeiture**

The Attorney General contends defendant has forfeited his Racial Justice Act challenge by failing to raise it by motion in the trial court, citing *People v. Lashon* (2024) 98 Cal.App.5th 804 (*Lashon*).  *Lashon* held, "[A] defendant may be found to have forfeited a section 745 claim of racial bias made for the first time on direct appeal in the absence of a showing that an exception to the forfeiture doctrine applies."  (*Id.* at p. 815.)

The *Lashon* court acknowledged the Legislature had amended section 745, subdivision (b) to allow defendants to raise Racial Justice Act challenges on direct appeal.  (*Lashon*, *supra*, 98 Cal.App.5th at p. 812.)  The court concluded, however, that language does not "indicat[e] a section 745 claim could be presented on direct appeal *for the first time*."  (*Lashon*, *supra*, at p. 812.)  Rather, according to the *Lashon* court, the Legislature's purpose in adding the "direct appeal" language was simply to provide additional procedural avenues for relief beyond petitions for writs of habeas corpus or motions under section 1473.7, the avenues set forth in the original version of the Act.  (See *Lashon*, at p. 812.)

The *Lashon* court reasoned, inter alia, that subdivision (c) of section 745 requires defendants making Racial Justice Act

10

motions in the trial court to do so " 'as soon as practicable upon the defendant learning of [an] alleged violation,' " and " '[a] motion that is not timely may be deemed waived, in the discretion of the court.' [Citation.]" (*Lashon*, *supra*, 98 Cal.App.5th at p. 813.) The court observed the requirement of timely filing in the trial court "is consistent with the basic rationale of the forfeiture doctrine—i.e., ' " ' "to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had." ' " ' [Citation.]" (*Ibid.*) The timely filing requirement also discourages defendants from choosing "for tactical reasons . . . not to pursue a claim of racial bias in the trial court ' "in the hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult." ' [Citation.]" (*Ibid.*) The court stated, "It makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Lashon*, *supra*, at p. 813.)

The court further noted the Legislature had amended section 1473, subdivision (e), the section of the Racial Justice Act governing habeas corpus petitions, to provide, "A petition raising a [section 745] claim . . . for the first time . . . shall not be deemed a successive or abusive petition." (*Lashon*, *supra*, 98 Cal.App.5th at pp. 811, fn. 3, 814.) The court deemed it significant the Legislature had not added similar "for the first time" language

11

when referring to claims raised on direct appeal. (*Id.* at p. 814.) The court found nothing else in the legislative history indicating "an intent by the Legislature to strip the courts of their discretionary authority to determine whether a section 745 claim is reviewable on direct appeal where the claim could have been but was not presented in the trial court." (*Lashon, supra*, at pp. 814–815.)

Several published Court of Appeal decisions have agreed with *Lashon*, and we have found none disagreeing with it. (See, e.g., *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41; *People v. Singh* (2024) 103 Cal.App.5th 76, 114.)

Defendant argues *Lashon* was wrongly decided or should be limited to its facts. Defendant further argues that a Racial Justice Act objection below would have been futile, and if it were not, his trial counsel was ineffective for not raising it.

It is important to recognize the value of bringing a Racial Justice Act claim in the trial court in the first instance. This is not just for the reasons stated in *Lashon*, or because there would be a record for appellate review. Asking a trial court to consider whether its proposed ruling reflects the court's own implicit biases, or could have the unintended consequence of playing to jurors' implicit biases, serves an important purpose in raising the court's consciousness of the biases the Racial Justice Act is intended to eliminate.

That said, we decline to address the parties' arguments concerning forfeiture, because assuming arguendo defendant's challenge is properly before us, we conclude it fails on the merits, as we discuss *post*. (See *Coleman, supra*, 98 Cal.App.5th at p. 720 [declining to rule on forfeiture issue and exercising

discretion to reach merits of Racial Justice Act claim on direct appeal].)

## C. Defendant Fails To Demonstrate a Violation of the Racial Justice Act

Like our First District colleagues who decided *Coleman*, "[w]e recognize the extraordinary need to root out both explicit and implicit biases that infect the judicial system and that the [Racial Justice Act] is an important tool to help achieve a more just judicial system." (*Coleman*, *supra*, 98 Cal.App.5th at p. 721.) We also acknowledge "that determining what does and what does not constitute the exhibition of 'bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful,' may be a difficult task." (*Ibid.*) Cognizant both of the importance of the Racial Justice Act, and the difficult task in applying it, we conclude defendant has not carried his burden to show a violation of the Act.

To recap, defendant asserts the trial judge violated section 745, subdivision (a)(2), which requires defendant to show by a preponderance of the evidence that "the judge . . . used racially discriminatory language . . . , or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." " 'A fact is proved by a preponderance of the evidence if . . . it is more likely than not that the fact is true.' [Citation.]" (*People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003.)

The only language defendant identifies as racially discriminatory is the trial court's statement during sentencing that defendant was a thief, fraudster, liar, and coward. Defendant argues that because he lacked a prior criminal record, the trial court's language demonstrates that "[u]nintentional

13

implicit bias impacted the trial court's rulings." To the extent defendant is suggesting the terms were unjustified, we note by his own admission he engaged in unemployment and pay loan fraud. Defendant does not explain how the terms used by the court to describe him are "racially charged or racially coded." (§ 745, subd. (h)(4).) The court's statements do not "compare" defendant "to an animal" or "reference" his "physical appearance, culture, ethnicity, or national origin." (*Ibid.*) Defendant fails to show the trial court's statement meets the definition of "[r]acially discriminatory language" for purposes of section 745.

We acknowledge that section 745, subdivision (a)(2) is not limited to racially discriminatory language; it addresses any exhibition of "bias or animus" based on race. Defendant argues the trial court's evidentiary rulings demonstrated racial bias or animus. Specifically, defendant argues the trial court's evidentiary rulings "painted" Weiss and defendant "with different brushes," presenting Weiss as a "totally respectable" person whom defendant had no reason to fear, while presenting defendant "as a Black criminal."

Defendant identifies in particular the exclusion of evidence that Weiss was a sex worker who engaged in other illegal activities, and whom defendant suspected was responsible for defendant's "soulmate" Smith-DaSilva's death. Defendant argues the exclusion of this evidence would lead the jury to conclude, incorrectly, that Weiss was a "law abiding white female" rather than a criminal who defendant reasonably believed might kill him. Defendant implies this misrepresentation was amplified by the exclusion of the evidence of the pistol found in the backpack three blocks from the crime scene, which evidence "is consistent

14

with one of Weiss's cohorts being nearby and ready to shoot [defendant] if she gave the signal."

Defendant argues that in contrast to the court's exclusion of negative evidence concerning Weiss, the court allowed the prosecution to "paint" defendant "in the worst possible light by [introducing] rap lyrics he purportedly posted to his Instagram account a day or so after Weiss's death . . . ." The court also admitted evidence that defendant engaged in unemployment and pay loan fraud.

The question, again, is whether it is more likely than not that these rulings were motivated by racial bias or animus, whether explicit or implicit, as opposed to some other reason. We conclude the answer is no. It is at least as likely, if not more so, that the trial court made the rulings based on legitimate assessments of relevance.

The court excluded evidence of Weiss's involvement in sex work, vaccination card fraud, and other unspecified illegal activity because the court found the evidence not relevant to defendant's contention that Weiss was dangerous or violent. The court invited the defense to explain why Smith-DaSilva's death was relevant to the charged crime, and when no such explanation was forthcoming, the court excluded that evidence as well. Similarly, the court concluded the evidence of a gun located on a rooftop three blocks from the crime scene was irrelevant absent a showing of a connection between that gun and defendant, Weiss, or the shooting. It was established that the gun was not the gun that killed Weiss. These are ordinary evidentiary rulings. We reject defendant's characterization of the rulings as reflecting racial bias.

15

As for the admitted evidence to which defendant objects, we agree with the trial court that defendant's Instagram posts were highly relevant given his references to "rose," which was both Weiss's middle name and part of the name of her business, and language suggesting a killing, including "dat bitch in dat car still twitchin," "blowin on dat rose pakkk cuz bitches getting smoked n.a.," and "That's a new pakkk. Shit smell like roses." These statements were probative of his state of mind regarding the shooting, a critical issue given defendant's assertion of self-defense. Similarly probative was defendant's statement, "Once you done crossed da takers da wrong way, you won't make it alive. We turning all the opps to pakkks on 623." Along with the detective's testimony that defendant referred to himself on social media as a "taker," this statement suggests defendant was motivated by revenge for being "crossed" as opposed to self-defense.

Defendant argues his statements on Instagram "were ambiguous in meaning," and "the detective did not offer any expertise to establish that [p]akkk meant dead body." Even without the detective's interpretation of the word "pakkk," we discern little ambiguity in defendant's statements in light of the conduct to which he admitted, namely shooting Madison Rose Weiss in her car. Again, the statements were highly relevant to defendant's state of mind and inconsistent with his claim of self-defense.

We reject defendant's characterization of his Instagram language as improperly admitted "rap lyrics." Although the Legislature has limited the admissibility of forms of creative expression in criminal proceedings (see Evid. Code, § 352.2), this does not extend to statements about the crime itself. (See *id.*,

16

subd. (a) [probative value of creative expression "for its literal truth . . . is minimal *unless* that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available"], italics added.)  The trial court in the instant case expressly acknowledged this distinction, stating "general rap lyrics" were inadmissible, but rap lyrics "relate[d] to" the charged incident were admissible.  The court properly admitted defendant's Instagram statements, which were created shortly after the shooting and contained specific details that referred to the crime and were probative of defendant's claim of self-defense.

The evidence that defendant engaged in unemployment and pay loan fraud was admissible to impeach his credibility, which defendant put at issue by testifying.  (See *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Doolin* (2009) 45 Cal.4th 390, 438.)

In short, the trial court's evidentiary rulings were judgment calls regarding relevance and the rules of evidence in which courts routinely engage.  They do not satisfy defendant's burden to demonstrate conscious or unconscious racial bias or animus by a preponderance of the evidence.

## DISPOSITION

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.